**Not for Publication**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **J.G. OPTICAL, INC.,**<br>*on behalf of itself and all others similarly situated,*<br><br>               **Plaintiff,**<br><br>       **v.**<br><br>**THE TRAVELERS COMPANIES, INC. and THE CHARTER OAK FIRE INSURANCE, COMPANY,**<br><br>              **Defendants.** | **Civil Action No. 20-5744 (ES) (MAH)**<br><br>**OPINION** |

**SALAS, DISTRICT JUDGE**

Plaintiff J.G. Optical, Inc. ("Plaintiff") initiated this action to recover on an insurance policy issued by defendant The Charter Oak Fire Insurance Company's ("Defendant") for alleged losses caused by the ongoing COVID-19 pandemic. Before the Court is Defendant's motion to dismiss Plaintiff's complaint (D.E. No. 1 ("Complaint" or "Compl.")) pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.E. No. 14 ("Motion")). For the reasons set forth below, Defendant's Motion is GRANTED.

## I.   BACKGROUND[1]

### A.   Plaintiff's Insurance Claim and COVID-19 Losses

Plaintiff is a New Jersey corporation which owns and operates an optometry business providing "eyeglasses, contact lenses, and related products" in Bloomfield, New Jersey. (Compl.

---

[1]   Unless otherwise indicated, all facts in this section are taken from the Complaint and are assumed to be true for purposes of this Opinion.

¶ 11).  Defendant is an insurance company organized under the laws of Connecticut and licensed to issue insurance in New Jersey and other states.  (*Id.* ¶ 14).  Defendant issued a commercial property insurance policy to Plaintiff covering the period from December 8, 2019, through December 8, 2020, (the "Policy").  (*Id.* at ¶ 15; *see also* D.E. No. 14-3, Ex. A ("Policy Agreement" or "Policy Agmt."[2])).

Beginning in March of 2020, as the outbreak of COVID-19 swept across the country, New Jersey, like a number of other states, enacted a series of measures designed to mitigate the spread of the SARS-CoV-2 virus that causes COVID-19 (the "Virus").   In particular, New Jersey Governor Phil Murphy issued executive orders which sought to establish and enforce rules governing the operations of businesses and public activities within the state.  On March 21, 2020, Governor Murphy issued Executive Order 107 ("EO 107") which ordered all New Jersey residents to remain in their homes except to perform certain enumerated activities deemed essential and that all "brick-and-mortar premises of all non-essential retailed businesses" close to the public immediately.  (D.E. No. 14-3, Ex. B ("EO 107") ¶¶ 2 & 6).  EO 107 carved out "essential retail businesses," including "ancillary stores within healthcare facilities," which were allowed to remain open while adhering to certain restrictions.  (*Id.* at ¶ 6(f)).

In the days and weeks that followed, Governor Murphy issued several more executive orders related to the management of the COVID-19 pandemic.  On March 23, 2020, Governor Murphy issued Executive Order 109 ("EO 109") which, among other things, suspended elective surgeries and invasive procedures and empowered the Director of the Division of Consumer

---

[2]      While the Policy Agreement is not attached to the Complaint, it is proper for the Court to consider it as an "undisputedly authentic document," upon which Plaintiff's claims are based.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents.").  Page references to the Policy correspond to the "Travelers Doc Mgmt" pagination provided in the bottom right-hand corner of each page thereof.

Affairs, in consultation with the Commissioner of the Department of Health, to issue binding orders "restricting or expanding the scope of practice for any category of healthcare professional." (D.E. No. 32-2 ("EO 109") ¶¶ 1 & 8).  Governor Murphy subsequently issued Executive Order 122 on April 8, 2020, providing for a number of further restrictions on the operations of essential retail businesses, including a 50% capacity limitation and social distancing and face covering requirements.  (D.E. No. 14-3, Ex. C ("EO 122") ¶ 1) ("EO 122," together with EO 107 and EO 109, the "Executive Orders"[3]).

Unfortunately, Plaintiff, like many local businesses, suffered financially as a result of COVID-19 and the related restrictions established by the Executive Orders.  Plaintiff alleges that, due to the Executive Orders, it "had to cease operating its business because it was deemed to be non-essential."  (Compl. ¶ 12).  On March 30, 2020, in response to an insurance claim submitted by Plaintiff for business interruption losses, Defendant issued a letter denying coverage because, among other things, "[Plaintiff's] premises did not suffer direct physical loss or damage, the [Executive Orders] did not cause direct physical loss or damage, and that the Virus and Bacteria exclusion applied."  (*Id.* ¶ 40).

B.    **The Policy**

The Policy is comprised of, among other forms of coverage not applicable here, all-risk commercial property insurance coverage for "direct physical loss of or damage to" Plaintiff's premises caused by or resulting from certain "covered causes of loss."  (Policy Agmt. at 15).  In the event a covered cause of loss causes or results in physical loss of or damage to Plaintiff's property which necessitates the suspension of Plaintiff's business operations, the Policy provides

---

[3]      Similarly, it is proper for the Court to consider the Executive Orders as they are "matters of public record." *Mayer*, 605 F.3d at 230.

coverage for, among other things, (1) lost "Business Income," including lost net income and operating expenses, sustained during the suspension of business operations; and (2) "Extra Expense" that would not have been incurred absent the direct physical loss of or damage to Plaintiff's property due to a covered cause of loss, including necessary expenses incurred during a "period of restoration" to minimize the suspension of business operations.  (*Id.* at 16–17).  In addition, the Policy extends such Business Income and Extra Expense coverage to actions of a "Civil Authority" which prohibit access to Plaintiff's property and are "due to direct physical loss of or damage to property at locations, other than [Plaintiff's insured property], that are within 100 miles of [Plaintiff's insured property], caused by or resulting from a Covered Cause of Loss." (*Id.* at 29).  The Policy in turn defines a "Covered Cause of Loss" for which these forms of coverage apply broadly as "risks of direct physical loss" unless such loss is limited or excluded elsewhere in the Policy.  (*Id.* at 17–18).

Beyond these forms of coverage, the Policy delineates various limitations or exclusions for certain losses for which insurance coverage is unavailable in whole or in part.  Among these exclusions, and of particular importance here, are the "Exclusion of Loss Due to Virus or Bacteria" (the "Virus Exclusion") and the "Ordinance or Law Exclusion."  The Virus Exclusion bars coverage "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."  (*Id.* at 108).  The Ordinance or Law Exclusion , meanwhile, excludes coverage for "loss or damage caused directly or indirectly" by "the enforcement of any ordinance or law . . . [r]egulating the construction, use or repair of any property."  (*Id.* at 36).  Finally, though not specifically titled, the Policy further excludes coverage "for loss or damage caused by or resulting from . . . [a]cts or

decisions, including the failure to act or decide, of any person, group, organization or governmental body" (the "Act or Decision Exclusion").  (*Id.* at 40).

### C.    Procedural History

On May 8, 2020, Plaintiff filed its six-count Complaint asserting claims on behalf of itself as well as a proposed nationwide class and New Jersey subclass of similarly situated entities which have: (i) purchased "standard all-risk commercial property insurance policies" from Defendant that provide coverage for lost business income and extra expense and do not exclude coverage for pandemics, and (ii) suffered losses due to various closure or "stay-at-home" orders enacted by civil authorities since March 15, 2020, including the Executive Orders.  (Compl. ¶ 52).  Broadly speaking, Plaintiff alleges that it suffered financial losses due to the necessary closure of its business by the Executive Orders, and that Defendant wrongfully denied insurance coverage for such losses.  (*See generally* Compl.).  The Complaint asserts both a breach of contract claim for damages as well as a claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, related to Defendant's denial of insurance claims under each of three separate forms of coverage in the Policy: (i) Business Income; (ii) Extra Expense; and (iii) Civil Authority.  (*Id.* ¶¶ 64–110).

On August 18, 2020, Defendant moved to dismiss the Complaint in its entirety, arguing primarily that (i) Plaintiff has failed to establish that its claim falls within the scope of the Policy because it has failed to allege any physical loss of or damage to its insured property; and (ii) the Policy specifically excludes coverage for losses sustained as a result of a virus such as the Virus that causes COVID-19 or actions or laws regulating the use of property such as the Executive Orders.  (*See generally* D.E. No. 14-1 ("Def. Mov. Br.")).

## II.    LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

"When reviewing a motion to dismiss, all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom."  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (internal quotation marks omitted).  The Court is not required to accept as true "legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    DISCUSSION

Plaintiff alleges that Defendant's denial of coverage under the Policy for losses suffered as a result of the Executive Orders enacted to mitigate the spread of COVID-19 constituted a breach of the insurance contract.  The Court disagrees.

### A.  Interpretation of Insurance Contracts Generally

Under New Jersey law, which the parties agree applies to interpretations of the Policy, the

principles of insurance contract interpretation are well-settled.  *State Nat. Ins. Co. v. Cnty. of Camden*, 10 F. Supp. 3d 568, 574–75 (D.N.J. 2014).  In particular, the terms of an insurance policy are "interpreted according to [their] plain and ordinary meaning[s]."  *N&S Restaurant LLC v. Cumberland Mut. Fire Ins. Co.*, 499 F. Supp. 3d 74, 78 (D.N.J. 2020) (citing *Voorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1260 (N.J. 1992)).  Thus, "[w]here the express language of the policy is clear and unambiguous, 'the court is bound to enforce the policy as it is written'" and "should not write for the insured a better policy of insurance than the one purchased."  *Buczek v. Cont'l Cas. Ins. Co.*, 378 F.3d 284, 288 (3d Cir. 2004) (quoting *Royal Ins. Co. v. Rutgers Cas. Ins. Co.*, 638 A.2d 924, 927 (N.J. Super. Ct. App. Div. 1994)).  Where, however, the policy language is ambiguous, it will be "interpreted to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning."  *Benamax Ice, LLC v. Merchant Mut. Ins. Co.*, 2021 WL 1171633, at *3 (D.N.J. Mar. 29, 2021) (quoting *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001)).  A genuine ambiguity exists "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage."  *Buczek*, 378 F.3d at 288.  Plaintiff, as the party seeking coverage, bears the "initial burden of establishing coverage under the [P]olicy."  *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009).

Similar interpretive rules apply with respect to exclusionary clauses within an insurance contract.  Such exclusionary clauses are "presumptively valid and are enforced if they are specific, plain, clear, prominent, and not contrary to public policy."  *Causeway Automotive, LLC v. Zurich Am. Ins. Co.*, No. 20-8393, 2021 WL 486917, at *4 (D.N.J. Feb. 10, 2021) (quoting *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (2010)).  Exclusionary clauses, however, are read narrowly and construed strictly against the insurer; if the language of an exclusionary clause is amenable to more

than one reasonable interpretation, "courts apply the meaning that supports coverage rather than the one that limits it." *Id.* (quoting *Flomerfelt*, 997 A.2d at 997); *see also N&S Restaurant*, 499 F. Supp. 3d at 78. That said, the Court can neither "disregard the clear import and intent of a policy exclusion" nor "rely on [f]ar-fetched interpretations of a policy exclusion in order to create an ambiguity requiring coverage." *Body Physics v. Nationwide Ins.*, 2021 WL 912815, at *4 (D.N.J. Mar. 10, 2021) (quotations omitted). A complaint may be properly dismissed where it is clear that the plaintiff's allegations "fall squarely within the policy's exclusion to coverage." *See N&S Restaurant*, 499 F. Supp. 3d. at 78. As the party seeking application of the policy exclusions, the defendant "bears the burden of establishing that the claim in question falls within the exclusionary clause." *Body Physics*, 2021 WL 912815, at *4.

With these principles in mind, the Court turns to an analysis of the Policy's potentially applicable coverages and exclusions.

**B.    The Virus Exclusion Excludes Coverage for Plaintiff's Claims**

Defendant contends that Plaintiff's losses were due to COVID-19, which is excluded from coverage under the unambiguous terms of the Virus Exclusion, and which, by definition, is not a "Covered Cause of Loss" for which the Policy's Business Income, Extra Expense, and Civil Authority coverages may apply. (*See* Def. Mov. Br. at 19–33). Plaintiff disagrees, arguing that the Virus Exclusion is ambiguous and that, in any event, COVID-19 was not the efficient proximate cause of Plaintiff's losses such that the Virus Exclusion does not apply. (D.E. No. 32 ("Pl. Opp. Br.") at 18–29). The Court agrees with Defendant that the Virus Exclusion applies and bars Plaintiff's claims.[4]

---

[4]     There is no dispute that COVID-19, or, more accurately, the Virus which causes COVID-19, is a virus that "induces or is capable of inducing physical distress, illness or disease" within the meaning of the Virus Exclusion. (Policy Agmt. at 108).

### 1.     *The Virus Exclusion Unambiguously Applies to Plaintiff's Claims*

Plaintiff contends that the Virus Exclusion is ambiguous because it can be reasonably understood to exclude coverage only for losses or damage due to a virus that is physically present on the insured premises. (*Id.* at 18–21). Plaintiff points to Section C of the Virus Exclusion, which provides that the Virus Exclusion, if applicable to a claim of loss or damage, supersedes any separate exclusion relating to "pollutants" which may otherwise apply to any such claim. (*Id.* at 19; *see also* Policy Agmt. at 108). Because other exclusions and coverages that relate to "pollutants" in the Policy all reference the physical clean-up of the insured premises, Plaintiff reasons, the Virus Exclusion, by making explicit reference to the treatment of "pollutants" elsewhere in the Policy, may reasonably be interpreted to be similarly limited to situations concerning the physical presence of a virus, bacterium, or other microorganism on the insured premises. (Pl. Opp. Br. at 20). In light of certain extrinsic evidence and the interpretive canon described above in which ambiguities in insurance contracts must be resolved in the insured's favor, Plaintiff argues that the Court must therefore conclude that the Virus Exclusion does not apply to bar coverage. (*Id.* at 20–21). The Court disagrees.

"[A]n insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants." *Causeway Automotive*, 2021 WL 486917, at *5 (quotations omitted). Rather, as noted above, an insurance policy is genuinely ambiguous, and must therefore be interpreted so as to favor coverage for the insured, only where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Buczek*, 378 F.3d at 288–89. Here, the Virus Exclusion is unambiguous, and its language is not so confusing as to leave any doubt about its scope or application. By its clear terms, the Virus Exclusion provides that Defendant will not pay "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical

distress, illness or disease." (Policy Agmt. at 108). There is nothing in this language that suggests that any such virus, bacterium, or other microorganism must be physically present on the insured premises for the exclusion to apply. Judges in this District who have considered similar provisions came to the same conclusion. *See Downs Ford, Inc. v. Zurich Am. Ins. Co.*, No. 20-08595, 2021 WL 1138141, at *4 (D.N.J. Mar. 25, 2021); *Causeway Automotive*, 2021 WL 486917, at *5; *Eye Care Center of N. J., PA v. Twin City Fire Ins. Co.*, 2021 WL 457890, at *3 (D.N.J. Feb. 8, 2021). Nor does the reference to "any exclusion relating to 'pollutants'" in Section C of the Virus Exclusion impose a physical presence requirement. (*See* Policy Agmt. at 108). Rather, the clear and unambiguous import of Section C is to differentiate viruses from "pollutants" generally. (*See id.* ("With respect to any loss or damage subject to the exclusion in Paragraph B., [the Virus Exclusion,] such exclusion supersedes any exclusion relating to 'pollutants'")). Indeed, if such a limitation were intended to be part of the Virus Exclusion, it could easily have been added in much the same way as in any exclusion relating to "pollutants." *See Downs Ford*, 2021 WL 1138141, at *4.

Accordingly, the Virus Exclusion unambiguously applies to Plaintiff's losses if they were caused by or resulted from a virus, such as the Virus that causes COVID-19.

### 2.   *Plaintiff's Losses Were Caused by COVID-19*

Plaintiff argues that even if the Virus Exclusion unambiguously applies to losses or damages caused by or resulting from viruses generally, even without any physical presence on or contamination of the insured premises, the Virus Exclusion still does not apply to Plaintiff's claims because the Executive Orders rather than COVID-19 itself were the "efficient proximate cause" of Plaintiff's losses. (Pl. Opp. Br. at 21–23). Once again, the Court disagrees.

Where the parties to an insurance policy dispute whether an insured's losses were "caused by" an excluded peril under the policy, New Jersey courts employ the efficient proximate cause

test, otherwise known as the "Appleman's Rule."  *See Causeway Automotive*, 2021 WL 486917, at *5 (citing *N.J. Transit Corp. v. Certain Underwriters at Lloyd's London*, 221 A.3d 1180, 1192 (App. Div. 2019)).  This rule provides that "if an exclusion bars coverage for losses *caused by* a particular peril, the exclusion applies *only if* the excluded peril was the efficient proximate cause of the loss."  *Id.* (emphasis in original) (quotations omitted).  Thus, absent an anti-concurrent or anti-sequential clause in the applicable exclusion, under Appleman's Rule, "an insured is normally afforded coverage where an included cause of loss is either the first or last step in the chain of causation which leads to the loss."  *Downs Ford*, 2021 WL 1138141, at *5 (quotations omitted). "[H]owever, the pertinent question is not where in the sequence the alleged cause of loss occurred, but what was the predominant cause that produced the loss."  *Causeway Automotive*, 2021 WL 486917, at *5.

Here, the Virus Exclusion does not contain an anti-concurrent or anti-sequential clause that would exclude coverage regardless of the sequence of events leading up to Plaintiff's loss.  (*See* Policy Agmt. at 108).  Nonetheless, this does not mean that the Executive Orders were necessarily the efficient proximate cause of Plaintiff's losses merely because they were last in a series of events which lead to the closure of Plaintiff's business.  There is no dispute that the Executive Orders were issued solely to mitigate the spread of COVID-19 and would not have been issued but for the spread of the Virus within New Jersey.  *See id.*; *see also 7th Inning Stretch LLC v. Arch Ins. Co.*, No. 20-8161, 2021 WL 519510, at *3 (D.N.J. Jan. 19, 2021).  Indeed, Plaintiff alleges in its Complaint that various governmental orders closing non-essential businesses have been issued across the country in order to "minimize the spread of COVID-19."  (Compl. ¶¶ 28 & 41).  Thus, COVID-19 and the Executive Orders issued to prevent its spread should not be seen as two separate, independent events contributing to a loss but rather as inextricably intertwined such that

the latter were entirely dependent and preconditioned on the existence of the former.  Accordingly, the Court finds that COVID-19 was the efficient proximate cause of Plaintiff's losses and, as such, Plaintiff's claims for insurance coverage with respect thereto fall squarely within, and are barred by, the Virus Exclusion.  In so finding, the Court joins the growing list of courts within and outside of this District that have reached the same conclusion when analyzing similar or identical virus exclusions.  *See, e.g.*, *Beach Glo Tanning Studio Inc. v. Scottsdale Ins. Co.*, No. 20-13901, 2021 WL 2206077, at *7 (D.N.J. May 28, 2021) (finding that state closure orders could not be efficient proximate cause of insured's losses "because the Closure Orders 'and the [V]irus [we]re so inextricably connected that it [wa]s undeniable that the [Closure] Orders were issued because [of] the [V]irus'" (alterations in original) (quoting *Causeway Automotive*, 2021 WL 2021 WL 486917, at *5)), *appeal filed*, June 8, 2021; *Quakerbridge Early Learning LLC v. Selective Ins. Co.*, No. 20-7798, 2021 WL 1214758, at *3–4 (D.N.J. Mar. 31, 20221) ("[T]he orders issued by Governor Murphy would not have been enacted but for the pandemic."), *appeal filed*, Apr. 20, 2021; *Body Physics*, 2021 WL 912815, at *6 ("Plaintiff admits that its alleged losses occurred because of the COVID-19 pandemic and the Governor's orders, which themselves were caused by the [V]irus."); *Del. Valley Plumbing Supply, Inc. v. Merchants Mut. Ins. Co.*, 2021 WL 567994, at *3 (D.N.J. Feb. 16, 2021) ("Therefore, '[b]ecause the Stay-at-Home Orders were issued to mitigate the spread of the highly contagious novel coronavirus, Plaintiff's losses are tied inextricably to that [V]irus.'" (quoting *Boulevard Carrol Entm't Grp., Inc. v. Fireman's Fund Ins. Co.*, No. 20-11771, 2020 WL 7338081, at *2 (D.N.J. Dec. 14, 2020))) (collecting cases).

Thus, because the Court finds that the Virus Exclusion is unambiguous, that COVID-19 was the efficient proximate cause of Plaintiff's losses, and that COVID-19 is a virus capable of

inducing physical distress, illness, or disease, it concludes that the Virus Exclusion applies and bars coverage for Plaintiff's losses.

### C.     The Court Need Not Decide Issues Relating to other Applicable Coverages or Exclusions in the Policy

The Virus Exclusion makes clear that it applies to "all coverage under all forms and endorsements" in the Policy, including "forms and endorsements that cover business income, extra expense, rental value or action of civil authority." (Policy Agmt. at 108). Therefore, because the Court has determined that the Virus Exclusion applies and bars coverage of Plaintiff's claims under the Policy, the Court need not determine whether other exclusions, such as the Ordinance or Law Exclusion, apply or whether Plaintiff has satisfied its burden of establishing that it has sustained any physical loss or damage. *See Beach Glo*, 2021 WL 220677, at *8 ("As a result [of the virus exclusion's coverage bar], whether Beach Glo has sustained any physical loss or damage is irrelevant."); *Body Physics*, 2021 WL 912815, at *6 ("[B]ecause the Virus Exclusion applies and is legally enforceable, the Court need not entertain the question of whether Plaintiff's alleged losses constitute 'direct physical loss . . . or damage.'") (alterations in original).

## IV.    CONCLUSION

The Court understands and is sympathetic to Plaintiff's circumstances. Plaintiff, like countless others, has suffered enormous loss as a result of the COVID-19 pandemic, threatening not just Plaintiff's livelihood, but the continued vibrance and success of our local communities. Notwithstanding this reality, however, the Court is not free to rewrite the terms of the Policy and is obligated to enforce the terms thereof as written.

Accordingly, for the reasons set forth above, Defendant's Motion is GRANTED. An

appropriate Order follows.


Date: September 20, 2021

s/Esther Salas
**Esther Salas, U.S.D.J.**